**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **JONDA R. HILL,** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 16 C 11011** |
| **v.** ) | |
| ) | **Magistrate Judge Sidney I. Schenkier** |
| **NANCY A. BERRYHILL, Acting** ) | |
| **Commissioner of Social Security,**[1] ) | |
| ) | |
| **Defendant.** ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>[2]

Plaintiff, Jonda R. Hill ("Mr. Hill"), has filed a motion for summary judgment seeking reversal or remand of the final decision of the Acting Commissioner of Social Security ("Commissioner") denying Mr. Hill's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") (doc. # 11: Opening Brief ("Pl.'s Mem.")). The Commissioner filed a response seeking affirmance of the decision denying benefits (doc. # 18: Def.'s Mot. for Summary J.; doc. # 19: Def.'s Mem. in Support of the Commissioner's Decision ("Def.'s Mem.")). Mr. Hill also filed a reply (doc. # 20: Pl.'s Reply to Def.'s Mem. in Support of the Commissioner's Decision ("Pl.'s Reply")). For the following reasons, we grant Mr. Hill's motion for summary judgment and deny the Commissioner's motion to affirm.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security Nancy A. Berryhill as the named defendant.

[2] On February 1, 2017, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 7).

## I.

Mr. Hill applied for DIB and SSI benefits on June 13, 2013, alleging he became disabled on February 8, 2013 (R. 19, 82-83, 89) due to sarcoidosis (growth of inflammatory cells in different body parts – most commonly lungs) and a heart condition ("walls too thick") (R. 82). His date last insured was March 31, 2016 (R. 82). Mr. Hill's claims were denied initially on October 9, 2013, and upon reconsideration on May 27, 2014 (R. 19, 87, 94, 106, 118). Upon timely request, a hearing was held before an Administrative Law Judge ("ALJ") on February 1, 2016 (R. 19, 37). The ALJ issued a decision on March 31, 2016, finding that Mr. Hill was not disabled (R. 16-36). The Appeals Council then denied Mr. Hill's request for review, making the ALJ's ruling the final decision of the Commissioner (R. 1-6). *See* 20 C.F.R. §§ 404.981, 416.1481; *Loveless v. Colvin*, 810 F. 3d 502, 506 (7th Cir. 2016).

## II.

### A.

Mr. Hill was born on October 7, 1961, and was 51 years old at his onset date (R. 82). On February 8, 2013, Mr. Hill was admitted to Stroger Hospital complaining of shortness of breath and chest pain (R. 902). While in the hospital, he was examined by pulmonologist, Patricia Macias, M.D., who found his symptoms consistent with sarcoidosis (R. 949). He was in fact diagnosed with granulomatous lung disease after a bronchoscopy performed found granulomas suggestive of sarcoidosis, and he was started on prednisone (medication providing relief for inflamed areas of the body) (R. 902). Mr. Hill also reported left hand numbness/paresthesias and was evaluated for a left axillary mass (R. 902, 914). On February 14, 2013, he was discharged from the hospital with instructions to follow up with various doctors (R. 902).

On June 27, 2013, Mr. Hill underwent surgery to remove the left axillary mass (R. 382-385). The following day during a cardiology consult, Mr. Hill reported to the doctor a "decreased exercise tolerance" and only being able to walk a block and a half before experiencing difficulty breathing (R. 347). On July 3, 2013, at a follow-up appointment with his pulmonologist, Dr. Macias, he was diagnosed with sarcoidosis and complained of difficulty breathing (R. 426-27). On July 29, Mr. Hill attended his physical therapy evaluation wherein he reported pain lifting his arm but also noted diminished swelling in his left arm (R. 435). The report noted a "precaution" of a five-pound lifting restriction by Mr. Hill's surgeon, Stefan Szczerba, M.D., but also stated that "upgrades should be clarified with Dr. Marcus" who assisted Dr. Szczerba with the surgery to remove the left axillary mass (Id.). On August 1, the precautions were lifted (R. 439).

On October 2, 2013, Mr. Hill was seen by Dr. Macias and reported his symptoms were getting worse, his shortness of breath did not improve, he felt more fatigued, and he had more headaches on his right side and memory loss (R. 555). Dr. Macias remarked that Mr. Hill's lungs were clear to auscultation and he had a normal range of motion, no swelling or deformity and a normal gait (R. 557). She continued him on the same medications but added Flonase and cetirizine for headaches (R. 558). Later in October, Mr. Hill saw his primary care physician, Titilayo Abiona, M.D., who noted that Mr. Hill had mild shortness of breath but also that he "smokes cigarettes" (R. 588). Upon examination, Mr. Hill's lungs were clear to auscultation and movements of his left shoulder improved (R. 591).

On October 3, 2013, a medical consultant for the Disability Determination services opined based on the record that Mr. Hill could occasional lift or carry 20 pounds and frequently lift or carry 10 pounds, stand or walk six hours in a work day, sit six hours in a work day and

perform unlimited pushing or pulling within the weight limitations (R. 85, 92). The consultant opined that Mr. Hill had the RFC to perform his past relevant work as a banquet manager (R. 87, 94).

Dr. Macias, Mr. Hill's pulmonologist, filled out a Sarcoidosis Residual Functional Capacity Questionnaire on November 6, 2013 and listed the frequency and length of contact as two months; however, the records indicate Dr. Macias had been treating Mr. Hill for nine months at that time (R. 445–47, 949). She diagnosed Mr. Hill with sarcoidosis and identified his symptoms as shortness of breath, chest tightness, fatigue and coughing (R. 445). Dr. Macias opined that Mr. Hill could tolerate moderate work stress and described his prognosis as "fair" (*Id.*). Dr. Macias noted that Mr. Hill could sit for more than two hours at a time before needing to get up, that he could stand for two hours at one time and that in an 8-hour work day he could stand or walk for two hours but could sit for eight hours (R. 446). Dr. Macias also indicated that Mr. Hill would need to take unscheduled breaks four times in an eight-hour day (every two hours) for 10 minutes to sit quietly (*Id.*) She opined that Mr. Hill could frequently lift and carry 10 pounds, rarely 20 pounds and never 50 pounds (*Id.*). Further, Mr. Hill could rarely stoop, crouch/squat or climb ladders, occasionally climb stairs and frequently twist (*Id.*). Finally, Dr. Macias opined that Mr. Hill's impairments would cause good and bad days and that on average he would be absent about four days per month from work as a result of his impairments (R. 447).

Mr. Hill saw Dr. Macias again on February 5, 2014 and reported pain and numbness in his hands and feet, and headaches with visual changes (R. 573). Mr. Hill's lungs continued to be clear to auscultation, and his range of motion was normal with no swelling or deformity (R. 575). Dr. Macias reported that from a pulmonary view point, Mr. Hill was stable and was to continue with the same medications (R. 578). Mr. Hill also reported numbness in his hands and feet to Dr.

Abiona on February 14, 2014, and some pain at the sight of the surgical incision (R. 568). In addition to other medications to manage his sarcoidosis, Mr. Hill was prescribed gabapentin for pain and referred for a rheumatology consultation (R. 571).

On February 25, 2014, Mr. Hill was examined by rheumatologist, Indira S. Hadley, M.D. Mr. Hill reported pain with sitting and walking, pain in his feet, and tingling in his right leg and right lateral foot with a "pins and needles sensation" (R. 661-62). Dr. Hadley continued the gabapentin prescription and noted a decreased pinprick sensation over right lateral foot and left midfoot (R. 664, 666). In Dr. Hadley's March 21, 2014 report, it was noted Mr. Hill's MRI of the brain was negative for sarcoidosis (R. 666-67).

Mr. Hill next underwent a needle electromyography ("EMG") of the lower and upper limbs on May 13, 2014 with Simon Zimnowodzki, M.D. (R. 991-92). The upper limbs test showed right and left chronic C7 denervation and radiculopathy (R. 992). On June 9, 2014, a cervical spine x-ray was performed on Mr. Hill with "mild osteoarthritis seen, between C4 and C5, C5-C6, C6-C7 with intervertebral disc space narrowing and spur formation" (R. 996). The x-ray also showed a "mild narrowing of intervertebral foramen seen from C4-C7" (*Id.*). Also on June 9, Mr. Hill was examined by Dr. Abiona and he again complained of numbness in his hands and feet and headaches (R. 998). In that report, an EMG showed possible radiculopathy and an MRI of Mr. Hill's brain showed nonspecific gliosis but was otherwise unremarkable (R. 1002-03).

On September 22, 2014, Mr. Hill was seen by a pulmonologist, Richard Lenhardt, M.D., and reported respiratory symptoms "when lying flat" (R. 1018). Dr. Lenhardt examined Mr. Hill and opined that Mr. Hill's sarcoidosis of the lungs had "improved markedly since last year" (R. 1020). Soon thereafter, Mr. Hill visited Dr. Abiona on October 3, 2014, who noted that the MRI

of Mr. Hill's spine showed cervical spondylosis and multilevel degenerative disc disease (R. 744, 1022, 1027-28).

On October 6, 2014, Mr. Hill presented to neurologist, Michael A. Kelly, M.D., with neuropathy (nerve damage) and complaining of headaches (R. 1030). Dr. Kelly's impressions were that Mr. Hill had headaches with a normal neurology examination and normal MRI to his head (R. 1035). Dr. Kelly opined that the headaches may be cervicogenic given the degenerative disc disease that was seen on Mr. Hill's cervical MRI (*Id.*). Transformed (increase in frequency) migraine was noted as a possibility but was not expected to be daily (*Id.*) Dr. Kelly's suggested treatment was lifestyle changes such as sufficient sleep, regular meals and stress reduction and he also prescribed amitriptyline (antidepressant and pain management) for headaches and the numbness in Mr. Hill's hands and feet (*Id.*).

On reconsideration on May 23, 2014, the medical consultant added limitations to the RFC after reviewing Dr. Macias' November 2013 "Sarcoidosis Residual Capacity Questionnaire" (R. 101, 113). The consultant gave Dr. Macias' opinion "great weight" but not "controlling weight" because the limitations were not totally supported by the evidence in the file (R. 102, 114). The medical consultant opined that Mr. Hill could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds; he could stand or walk six hours in a workday; sit six hours in a workday; was limited in the left upper extremity in pushing and pulling; could occasionally climb ramps, stairs, ladders, ropes and scaffolds; was unlimited in balancing and stooping; and could frequently kneel, crouch and crawl (R. 103, 115). Additionally, Mr. Hill was limited in reaching in front, laterally or overhead on his left extremity but was unlimited in handling, fingering and feeling (R. 104, 116). Mr. Hill also had environmental limitations due to

his sarcoidosis (*Id.*). The consultant opined that Mr. Hill's past relevant work was "expedited," however; he could sustain a "light" work capability (R. 106, 118).

At a January 5, 2015 physical, Mr. Hill denied headaches, psychiatric disease or a history of depression (R. 762). He also denied shortness of breath and numbness and tingling (R. 763). Chest x-rays on January 27, 2015 showed "some slight prominence of the hilar structures and mild interstitial changes in the upper lobes consistent with old sarcoid" but no acute infiltrates (substance denser than air) (R. 792). Also in January, Mr. Hill reported at a pulmonary visit that he was breathing well and had no recent emergency room visits (R. 846). In a pulmonary function report dated May 28, 2015, the testing showed borderline restrictive ventilatory defect (reduction in total lung capacity) but normal diffusion capacity (transport of gas into and out of the blood) (R. 803).

At a rheumatology appointment with Dr. Hadley on February 17, 2015, Mr. Hill complained of pain in his hands and forearm and had intermittent left hand swelling for a month (R. 861). Mr. Hill also stated there was "improvement in neuropathy symptoms in hands and foot" (*Id.*). Furthermore, he had no shortness of breath but did have joint pain (R. 862). Upon examination, Mr. Hill's lungs were clear to auscultation and he had a normal range of motion, normal strength and no tenderness; however, he was positive for soft tissue swelling of his left hand and forearm that was "pitting in nature" (pressure-induced indentation) (R. 864). Mr. Hill had full range of motion of his shoulders, elbows, wrists and knees but was tender in 18 out of 18 fibromyalgia points (*Id.*).

Mr. Hill underwent a lumbar spine MRI on June 28, 2015, which showed "multilevel degenerative disc disease and degenerative facet arthropathy" (R. 793-94). In Dr. Hadley's June 30, 2015 report, she noted that the MRI showed "L4-L5 disc bulge and ? [sic] nerve compression

of L5" (R. 1067). Dr. Hadley noted that Mr. Hill was seen in the pain clinic for an upcoming epidural injection (R. 1067). Dr. Hadley increased his gabapentin dose to ease Mr. Hill's pain, and he was issued a lumbar corsette (R. 1013, 1067).

On October 22, 2015, x-rays of Mr. Hill's left shoulder showed "no acute changes" and no significant osteoarthritis (R. 1073). In December 2015, Mr. Hill reported worsening of his breathing with increased walking and the winter weather (R. 1119). Mr. Hill's lungs were clear to auscultation and his respirations were non-labored at a January 12, 2016 examination (R. 1126). Mr. Hill had body mass index calculations of 30 to 35 during the relevant time period, indicating obesity (R. 363, 571, 837).

On January 4, 2016, Mr. Hill's primary care physician, Dr. Abiona, filled out a Physical Residual Functional Capacity Questionnaire (R. 1075–79). Dr. Abiona indicated that she had seen Mr. Hill every three months since June 5, 2013, described his prognosis as "fair" and opined that his impairments have lasted or will be expected to last twelve months (R. 1075). She noted that Mr. Hill has "sharp" and "burning" pain in his neck, shoulder and lower back that registers at an eight out of 10 (R. 1075). Additionally, she stated that he has reduced sensation and swelling in his left upper extremity and limited movement of the left shoulder (R. 1075). Emotional factors contribute to the severity of his limitations and he suffers from depression and PTSD (R. 1076). Dr. Abiona opined that Mr. Hill's pain was severe enough to "constantly" interfere with attention and concentration to perform simple work tasks and that he was only capable of low stress jobs due to his history of depression and PTSD (*Id.*). Dr. Abiona also opined that he could walk half a city block without rest or severe pain and he can sit or stand for 15 minutes at a time (*Id.*). Dr. Abiona also indicated that in an 8-hour working day, Mr. Hill could sit and stand/walk for less than two hours and he would need to include periods of walking

every 20 minutes for 10 minutes at a time (R. 1077). Dr. Abiona further opined that Mr. Hill would require a job permitting shifting positions at will and unscheduled breaks every 40 minutes lasting 10-15 minutes (*Id.*). Additionally, Mr. Hill could "occasionally" lift less than 10 pounds, but "never" 10 pounds or more (*Id.*). Mr. Hill could "rarely" look down, turn his head right or left, look up or hold his head in static position and could "never" twist, stoop (bend), crouch/squat, or climb ladders and "occasionally" climb stairs (R. 1078). Dr. Abiona opined he had significant limitations with reaching, handling or fingering and during an eight-hour work day he could grasp, turn or twist objects 60 percent of the time with his right hand and 30 percent of the time with his left hand; he could perform fine manipulations with his fingers 50 percent of the time with his right fingers and 20 percent of the time with his left fingers; he could reach (including overhead) 80 percent of the time with his right arm and 30 percent of the time with his left arm (*Id.*).

**B**

Mr. Hill was also examined and treated for mental impairments. On a referral from Dr. Abiona, Mr. Hill underwent a psychiatric evaluation on October 30, 2014 with Samina N. Khattak, M.D., at which time he reported occasionally hearing voices at night, feeling "anxious around people" and having panic attacks (R. 745, 877). Mr. Hill was diagnosed with post-traumatic stress disorder ("PTSD") and major depressive disorder (R. 747, 881). He was referred for therapy and prescribed the medications citalopram (antidepressant) and risperidone (antipsychotic medication also known as Risperdal) (*Id.*).

In a psychiatric evaluation at Thresholds[3] on January 14, 2015, Mr. Hill reported that the previously prescribed medications were not "making much of [a] difference" although the

---

[3] Thresholds provides healthcare, housing and hope for thousands of persons with mental illness and substance use disorders in Illinois each year. (www.thresholds.org/about last visited May 21, 2018).

Risperdal was helping some with sleep (R. 888). Mr. Hill also conveyed symptoms of hyperstrartle, hypervigilance, a history of violent trauma, irritability and recurrent nightmares related to his traumatic past (*Id.*). Mr. Hill's examination revealed a depressed mood and normal affect (*Id.*).

At a follow up appointment with Dr. Khattak on February 26, 2015, it was noted that Mr. Hill could not tolerate the risperidone and the citalopram did not help him (R. 1098). Dr. Khattak described Mr. Hill's psychiatric problems as "moderate" and "worsening" (*Id.*). Mr. Hill was referred to individual therapy and prescribed three new medications: aripiprazole (used to treat major depressive disorder), fluoxetine (antidepressant), and prazosin (used to treat high blood pressure) (R. 1101).

Mr. Hill saw Dr. Khattak again on June 15, 2015, and recounted that he continued to have nightmares, paranoia, depression and mood swings (R. 1103). Upon examination, Mr. Hill's mood and affect were anxious and depressed and his behavior was hostile (R. 1105). He was again referred to therapy and continued on the medications aripiprazole and fluoxetine while trazodone (antidepressant) was added (R. 1106).

At Mr. Hill's October 6, 2015 appointment with Dr. Khattak, he reported "drinking heavy, unable to relax and always in pain" (R. 1112). His mood and affect were described as anxious and depressed and his behavior was congruent (R. 1114). Additionally, his diagnoses of major depressive disorder and PTSD were worsening and the dosages of his medications were increased (R. 1115-16).

### III.

Mr. Hill appeared for a hearing before the ALJ on February 1, 2016 (R. 39). He was represented at the hearing by an attorney (*Id.*). Mr. Hill testified that he has been homeless since

February 2011 (R. 43); he has lived in the garage at his cousin's trucking company since July 2012 (pre-onset) (R. 44-46). Mr. Hill worked for Barry Hobart Construction between March and June of 2014 for five to 10 hours a day five to six days a week, but stopped due to the issues he was experiencing with his left arm, shoulder and back (R. 44-45).

Prior to his work in construction, Mr. Hill testified that he worked in the hospitality business from 2002 to 2007 at various hotels as a banquet employee followed by a banquet manager (or banquet captain) (R. 46-49). In 2010 and 2011, Mr. Hill testified that he lived in Louisville, Kentucky, and worked for a temporary agency, Labor Ready, where he was placed at a Walmart store and drove the forklift, relocated long aisle shelves, restocked, built shelves, unloaded tractor trailers and took supplies out to the floor on pallets (R. 51).

Mr. Hill testified that he can no longer work due to the large mass that was growing under his left arm that caused him pain, numbness and swelling (R. 52). He had surgery and a "mass the size of a porterhouse steak" was removed along with several lymph nodes (R. 53). He testified that since the 2013 surgery, he continued to experience "constant" pain and constant swelling in his left hand that is exacerbated if he overexerts himself lifting with that hand (*Id.*). Despite the surgery, he still has tingling and numbness in his hands (R. 65). He also experiences lower back pain and if he moves the wrong way he could throw his back out and "be out of whack for at least two months" (R. 53). The pain runs down his back and sometimes down his legs (*Id.*). He uses a heating pad and takes pain medication but the pain pills do not work (*Id.*). On a normal day, Mr. Hill testified that his back pain is between a six and an eight on a scale of one to 10 with 10 being horrendous pain (R. 55-56). The pain in his back is more severe than the pain in his shoulder (R. 56).

Mr. Hill testified that he also received treatment for his lungs; he has three inhalers and he expected to resume sarcoidosis medication after his breathing test showed that it was flaring up (R. 54). The sarcoidosis also causes him issues with his lungs, for instance, if he overexerts himself, he "find[s] [him]self gasping for air" (R. 56). Mr. Hill testified that wintertime is more problematic because the air is thinner and he feels exhausted faster (R. 66). Additionally, he has gained weight while on the sarcoidosis medication prednisone (*Id.*).

With regard to his mental impairments, Mr. Hill testified that he suffers from major depressive disorder and PTSD (R. 58). He has never been hospitalized for these disorders; however, he testified that Thresholds visits him once a week or every other week (*Id.*). He testified that he experiences depressive episodes – where he is "emotionally compromised," his voice shakes, he has tears in his eyes, he will cry while watching a movie or listening to a song – "at least four times a week" and they last from five to 30 minutes (R. 70). He testified he stopped taking his mental health medications, citalopram and risperidone, in February 2015 because it swelled up his throat and gave him a rash (*Id.*). His doctor then adjusted his mental health medications (*Id.*).

Additionally, he reported to his psychiatrist, Dr. Khattak, that he hears voices and testified that he will be in a deep sleep and he will "hear somebody call my name and it'll wake me up" or he will hear conversations off in the distance (R. 67). He also hears voices during the day and on average it occurs twice a week (R. 68). Mr. Hill also testified that he hates crowds (R. 61).

During a normal day, Mr. Hill testified that he does not move much (R. 58-59). He does some cleaning but "[i]t's not a regular daily thing" (R. 59). He testified that he cooks Sundays and Thursdays to last him throughout the week because he does not have a stove, only a

microwave and a hotplate (*Id.*). He has a friend or his cousin take him to the grocery store (*Id.*). He has "problems holding a gallon of milk" due to the swelling in his hand (R. 61, 66). He was drinking alcohol in the evenings to alleviate his pain but he testified he stopped four or five months ago at the suggestion of his doctor because it was not helping with the pain (R. 63). He also stopped smoking cigarettes and marijuana around the same time (R. 65, 69).

Mr. Hill testified that he lives in a rural area and the closest bus stop is two miles away so he does not go anywhere (R.60). To get to the hearing, Mr. Hill testified that he woke up at 2:00 a.m. to "charge" himself up to walk to the bus stop (*Id.*). It took him 45/46 minutes to walk to there (*Id.*). Generally, he can only walk a couple of blocks before he needs to take a break (R. 71). Mr. Hill receives medical transportation to all of his doctors' appointments through his county care (R. 63). He has problems sitting and can only sit for seven to 10 minutes before he has to maneuver himself (R. 61-62). He testified he can stand for 20 minutes before his back and leg will start to bother him and he needs to move or walk around (R. 71).

A vocational expert ("VE") testified next (R .72). The ALJ gave the VE a hypothetical of a person with the same age and education as Mr. Hill with the same past jobs, who: (a) is limited to light work, (b) can only occasionally push and pull with the left upper extremity, (c) can only occasionally reach in all directions including overhead with the left upper extremity, (d) has no limits on the right for reaching, (e) can occasionally climb ramps and stairs but never ladders, ropes and scaffolding, (f) can balance, stoop, kneel, crouch, and crawl occasionally, and (g) should avoid any concentrated exposure to humidity and wetness, dusts, fumes, odors and gases, or pulmonary irritants, extreme of cold or extreme of heat (R. 74).

The VE testified that the individual would not be able to perform any of Mr. Hill's past work, but that other work would be available that the individual could perform (R. 75). The ALJ

then added a limitation to simple routine tasks, simple work-related decisions and no more than occasional contact with coworkers, supervisors and the public (R. 76). The VE testified that the same work would be available for such an individual (*Id.*). The VE testified that the maximum off-task tolerated in these jobs was 15 percent cumulative and one half day absences per month for non-collective bargaining positions and one day per month for collective bargaining positions per year (R. 77-78).

## IV.

In his March 31, 2016 opinion, the ALJ followed the familiar five-step process for determining disability. At Step One, the ALJ found that Mr. Hill had not engaged in substantial gainful activity ("SGA") since February 8, 2013, the alleged onset date (R. 21). At Step Two, the ALJ found that Mr. Hill had the following severe impairments: sarcoidosis, obesity, degenerative disc disease, anxiety disorder and affective disorder (*Id.*). The ALJ determined at Step Three that none of these impairments – alone or in combination – met or equaled a listed impairment (*Id.*). The ALJ also determined there was no evidence that Mr. Hill's obesity in combination with the impairments met or equaled any listing, and that the obesity by itself was not medically equivalent to a listing (R. 22).

Further, the ALJ found that Mr. Hill's mental impairments did not satisfy the "paragraph B" criteria because he experienced only mild restrictions in activities of daily living, mild difficulties in social functioning, moderate difficulties in concentration, persistence or pace, and no episodes of decompensation of extended duration (R. 22-23). In making this finding, the ALJ noted that Mr. Hill did not report difficulties caring for his personal hygiene or performing household chores due to his mental health symptoms, and though he does not like crowds, Mr. Hill does go grocery shopping (R. 22). In addition, though Mr. Hill had difficulty concentrating

on his classwork when he attempted to attend college, he did not report difficulties concentrating on watching television shows (R. 22). Additionally, the ALJ determined the evidence failed to establish the presence of the "paragraph C" criteria (R. 23).

Next, the ALJ determined that Mr. Hill had the residual function capacity ("RFC") to perform light work except he can only occasionally push and pull with the left upper extremity; occasionally reach, including overhead, with the left upper extremity; occasionally climb ramps and stairs; never climb ladders and scaffolds; occasionally balance, stoop, kneel, crouch and crawl; and never be exposed to humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, and extreme heat (R. 23). Mr. Hill was also limited to performing simple, routine tasks and could interact only occasionally with supervisors, coworkers and the public (*Id.*).

The ALJ noted that Mr. Hill's medical records show breathing problems and left arm problems due to sarcoidosis, but opined that the records also showed improvement of these problems with treatment (R. 24). The ALJ reviewed Mr. Hill's medical records, including the care he sought for the growing left axillary mass; his June and July 2013 surgery to remove the mass; and his diagnosis of sarcoidosis (*Id.*). He further detailed various appointments with Mr. Hill's physical therapist, primary care provider, rheumatologist and pulmonologist in 2013 through 2015 (R. 24-26). The ALJ concluded that while Mr. Hill has severe impairments, they are not so "severe as to prevent [Mr. Hill] from performing basic work activities" within the limitations set forth in the RFC (R. 26). With regard to his mental impairments, the ALJ noted that the medical records showed no treatment prior to 2014, and showed only "minimal abnormalities upon examination" (*Id.*). The ALJ mentioned the psychiatrist (although not by name) visits, diagnosis of PTSD and major depressive disorder, the medications (although not by name) prescribed, and the referral for therapy (*Id.*).

The ALJ found that Mr. Hill's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that his statements concerning intensity, persistence and limiting effects of the symptoms were "not entirely credible" (R. 23-24). The ALJ explained that Mr. Hill's "varied activities suggest his abilities are greater than alleged" (R. 26-27). His "varied activities" included keeping his home clean and cooking twice per week, grocery shopping, walking 45 minutes to the bus stop to attend the hearing, and heavy lifting in May 2015 helping a friend work on his garage (R. 27).

The ALJ gave "great weight" to the opinions of the non-examining State agency medical consultants from 2013 and 2014, "little weight" to Mr. Hill's treating physician, Dr. Abiona, and the "examining doctor" at John H. Stroger Jr. Hospital ("Stroger Hospital")[4] and "no weight" to the GAF score of 52 from January 2015 (R. 27-28, 887-88). The ALJ found that the state agency opinions were generally consistent with Mr. Hill's medical records, which showed Mr. Hill's breathing problems and left arm problems improved with treatment (R. 27). In addition, the ALJ stated that the record does not contain a medical opinion from a treating source that further limits his work-related activities (*Id.*). The ALJ also stated that "these medical consultants are licensed physicians who are familiar with the evidentiary requirements for making disability determinations under the Social Security Act" (*Id.*).

In assigning little weight to Mr. Hill's treating physician, the ALJ found that Dr. Abiona's opinion was "generally not supported by the medical records, which show minimal clinical abnormalities and improvement of his symptoms with treatment" (R. 27-28). The ALJ also stated that unlike the state agency consultants, "Dr. Abiona is not familiar with the

---

[4] The ALJ does not identify the doctor's name; however, it is Dr. Macias, Mr. Hill's treating pulmonologist (R. 27, 447).

evidentiary requirements for making disability determinations under the Social Security Act" (R. 28).

The ALJ also assigned little weight to the opinion of the "examining doctor" (Dr. Macias) at Stroger Hospital stating that this opinion was "generally not supported by the medical records, which show minimal clinical abnormalities and improvement of his symptoms with treatment" (R. 27). The ALJ continued that the doctor stated that Mr. Hill was treated for two months at the time of the doctor's opinion, and further that "this physician is not familiar with the evidentiary requirements for making disability determinations under the Social Security Act" (R. 27). The ALJ did not discuss what weight, if any, he gave to the opinions and reports of any of Mr. Hill's other treaters, including his treating psychiatrist, Dr. Khattak.

At Step Four, the ALJ determined that Mr. Hill was unable to perform past relevant work, but at Step Five, the ALJ found that there were a significant number of jobs in the national economy that Mr. Hill could perform (R. 28-29). Therefore, the ALJ found Mr. Hill "not disabled" (*Id.*).

## V.

We review the ALJs decision deferentially to determine if it was supported by "substantial evidence," which the Seventh Circuit has defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

Plaintiff raises three arguments for remand: (1) the ALJ failed to give proper weight to Mr. Hill's treating physicians; (2) the ALJ's RFC is not supported by substantial evidence; and (3) the ALJ's credibility determination is erroneous. (doc. # 11: Pl.'s Mem. at 7). We remand based on Plaintiff's first argument that the ALJ did not properly weigh Mr. Hill's treating physicians' opinions; we therefore do not address Plaintiff's other challenges to the ALJ's decision.

## VI.

A treating physician's medical opinion is entitled to controlling weight if it is "well supported by objective medical evidence and consistent with other substantial evidence in the record." *Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016) *quoting Roddy v. Astrue*, 705 F. 3d 631, 636 (7th Cir. 2013). The agency's regulations shed light on how the ALJ should approach the question of the weight to be given to a treating doctor's opinion. "They state that more weight should be given to the opinions of doctors who have (1) examined a claimant, (2) treated a claimant frequently and for an extended period of time, (3) specialized in treating the claimant's condition, (4) performed appropriate diagnostic tests on the claimant, (5) offered opinions that are consistent with objective medical evidence and the record as a whole." *Roddy*, 705 F.3d at 637 *citing* 20 C.F.R. § 404.1527(c)(2)(i),(ii). Furthermore, an "inadequate evaluation of a treating physician's opinion requires remand." *Cullinan v. Berryhill*, 878 F.3d 598, 605 (7th Cir. 2017).

Here, the ALJ afforded "little weight" to the opinions of Mr. Hill's treating physicians, Dr. Abiona and Dr. Macias (whom the ALJ did not identify by name but only as an "examining doctor"), because they were "generally not supported by the medical records, which show

minimal clinical abnormalities and improvement of his symptoms with treatment" (R. 28). The ALJ's analysis to reach that conclusion falls short in several regards.

*First*, the ALJ did not discuss the frequency with which Mr. Hill had been actually examined by Dr. Abiona – every three months since June 5, 2013 – at the time of her opinion in January 2016 (R. 1075). With regard to Dr. Macias, the ALJ stated that the "examining doctor" had treated Mr. Hill for two months at the time of the opinion (R. 27). That is simply incorrect. The medical records show that Dr. Macias had examined Mr. Hill at least five times during a nine-month period prior to completing the RFC questionnaire (R. 376, 379, 420, 542, 555, 593, 947). Frequency of treatment is an important consideration in deciding what weight to give a treater's opinion. *See Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). The failure to address the frequency of Dr. Abiona's treatment, and the significant understatement of the frequency of Dr. Macias' treatment, are significant errors. We reject the Commissioner's attempt to dismiss the error concerning Dr. Macias' frequency of treatment as harmless (Def.'s Mem. at 4-5), particularly when the ALJ considered what he believed to be a short period of treatment important enough to cite to it in explaining why he gave Dr. Macias' opinion "little weight."

*Second*, the ALJ referred to Dr. Macias only as an "examining doctor" without acknowledging that Dr. Macias is a pulmonologist specializing in the treatment of the respiratory system (R. 27). Again, whether a treater specializes in the area of treatment is an important consideration under the regulations and case law in deciding what weight to give a treater's opinion; it is a consideration the ALJ failed to address.

*Third*, the record includes treatment notes, which the ALJ did not analyze, that are consistent with the RFC assessment of Drs. Abiona and Macias. On February 25, 2014, a rheumatologist, Dr. Hadley, examined Mr. Hill and continued the gabapentin prescription. Dr.

Hadley also noted a decreased pinprick sensation over right lateral foot and left midfoot (R. 664, 666). Additionally, on October 6, 2014, Mr. Hill's neurologist, Dr. Kelly, prescribed amitriptyline for his headaches and the numbness in Mr. Hill's hands and feet (R. 1035).

At another rheumatology appointment with Dr. Hadley on February 17, 2015, Mr. Hill had a normal range of motion, normal strength and no tenderness; however, he was positive for soft tissue swelling of his left hand and forearm that was "pitting in nature," Dr. Hadley noted that while Mr. Hill had full range of motion of his shoulders, elbows, wrists and knees, he was tender in 18 out of 18 fibromyalgia points (R. 864).

Mr. Hill underwent diagnostic tests such as a lumbar spine MRI on June 28, 2015, which showed "multilevel degenerative disc disease and degenerative facet arthropathy" (R. 793-94). In Dr. Hadley's June 30, 2015 report, she noted that the MRI showed "L4-L5 disc bulge and ? [sic] nerve compression of L5," that Mr. Hill was seen in the pain clinic and planning for an epidural injection, and she increased his gabapentin dose (R. 1067). He was also issued a lumbar corsette (R. 1013).

Lastly, the ALJ did not discuss what weight should be given to the opinions of Mr. Hill's treating psychiatrist, Dr. Khattak, whom he saw from October 2014 to October 2015 (when the records in this matter cease), and the psychiatrist and therapists that Mr. Hill met with from Thresholds (R. 745, 747, 877, 881, 888, 1098, 1101, 1105, 1106, 1112, 1114). During that time period, Mr. Hill was diagnosed with PTSD and major depressive disorder (R. 747, 881), he was prescribed various antidepressant and antipsychotic medications in increasing dosages (R. 747, 881, 1101, 1106, 1115-16), his mood and affect were labeled as anxious and depressed and his behavior was labeled as hostile (R. 1105) and his psychiatric diagnoses were described as "worsening" (R. 1098, 1115-16).

An ALJ cannot cherry-pick evidence that supports a non-disability finding while ignoring evidence that may point to a finding of disability. *Huber v. Berryhill*, No. 17-2284, 2018 WL2084793 *3 (7th Cir. May 4, 2018). In light of these records the ALJ did not address, we conclude that the ALJ failed to build the necessary logical bridge from the evidence to his summary conclusion that the agency consultants were entitled to "great weight" because their opinions – and not those of Mr. Hill's treaters – were "generally consistent with the claimant's medical records" (R. 27).

*Fourth*, we note that the ALJ, no less than three times, cited whether a physician was familiar with the "evidentiary requirements for making disability determinations under the Social Security Act" as a relevant factor in deciding what weight to give the particular physician (R. 27-28). We find no basis in the regulations or the case law for the proposition that this consideration is a permissible basis to decide the weight to be given to a treater's opinion. And with good reason. "Whether the applicant is sufficiently disabled to qualify for social security disability benefits is a question of law that can't be answered by a physician." *Garcia v. Colvin*, 741 F.3d 758, 760 (7th Cir. 2013); *See also* 20 C.F.R. §§ 404.1527(d) and 416.927(d) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled" rather, "the final responsibility for deciding these issues is reserved to the Commissioner"). The medical sources provide the ALJ with the material needed to make that decision in their treatment records, and their findings and opinions on the nature and severity of an applicant's impairment(s). An ALJ is not entitled to disregard a treater's opinion merely because an agency consultant (who is familiar with the disability procedure under the SSA) disagrees. *Cf. Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (finding an "ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the

record; a contradictory opinion of a non-examining physician does not, by itself, suffice"). Nor is an ALJ allowed to give more weight to the agency consultant's opinion because the ALJ presumes that the consultant is more familiar with the process than is a treating physician. The ALJ's decision to do so here was erroneous.

## <u>CONCLUSION</u>

For the foregoing reasons, plaintiff's motion for summary judgment (doc. # 11) is granted, and the Commissioner's motion for affirmation of the ALJ's decision (doc. # 18) is denied. We remand the case for further proceedings consistent with this opinion. The case is terminated.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATED:   May 24, 2018**